**WESTERN MINING CORPORATION, LIMITED, Plaintiff,**

v.

**STANDARD TERMINALS, INC., Defendant.**

**Civ. A. No. 83–450.**

United States District Court, W.D. Pennsylvania.

Jan. 10, 1984.

Thomas E. Lippard, Houston, Cohen, Harbaugh & Lippard, Pittsburgh, Pa., for plaintiff.

Ira S. Lefton, Pittsburgh, Pa., for defendant.

## MEMORANDUM AND ORDER

MENCER, District Judge.

This civil action for damages presents a number of somewhat unsettled questions of law in the subject area of bailments with warehousemen. This discussion will revolve, in large part, around section 7–204 of the Uniform Commercial Code, 13 Pa.C. S.A. § 7204, and case law interpreting that section. The Court has before it cross motions for summary judgment and a motion by defendant Standard Terminals, Inc. (Standard Terminals) to strike the Affidavit of William N. Leiber, filed in support of plaintiff Western Mining Corporation, Limited's (Western Mining) motion for summary judgment.

### Motion to Strike Affidavit

Rule 56 of the Federal Rules of Civil Procedure governs a trial court's handling of summary judgment motions. The rule states that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). An affidavit which does not comply with the requirements of Rule 56(e) is subject to a motion to strike. *McSpadden v. Mullins,* 456 F.2d 428, 430 (8th Cir.1972); *Green v. Benson,* 271 F.Supp. 90, 96 (E.D.Pa.1967).

■ William N. Leiber is a private investigator hired by Western Mining's attorney to investigate the possibility of thefts at Standard Terminals' warehousing complex. Standard Terminals' primary objection to Leiber's affidavit is that it is based not on personal knowledge, but rather, solely on Leiber's conversations with others. The information supplied in the affidavit is in the nature of hearsay and would be inadmissible at a trial of this matter. *See* Fed. R.Evid. 801(c), 802. Although, as is asserted by plaintiff's counsel, our granting of the motion may be largely academic because of the existence in the record of evidence establishing the same points as are raised by Leiber's affidavit, we will strike the affidavit of William N. Leiber in order to protect the integrity of the summary judgment procedure from dilution by the introduction of evidence which would be inadmissible at trial.

### Motions for Summary Judgment

#### Facts

Summary judgment is the appropriate disposition of a case if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The parties have spent considerable space in their briefs setting out their respective, and varying, versions of the facts of this case; however, the Court, after an independent review of the record, finds the following uncontested facts to be material to a determination of the legal issues before us.

Western Mining, the bailor, is involved in the sale of nickel products to the marketplace in North and South America; Standard Terminals, the bailee, is primarily engaged in the commercial warehousing business and operates a warehouse facility in Arnold, Pennsylvania. This warehouse facility consists of eleven warehouses and other buildings situated within a fenced-in compound of approximately five or six acres. In 1978, representatives of Western Mining and its insurer inspected the warehouse involved in the present action. Based on these inspections, use of the Arnold facility was approved for storage of Western Mining's nickel and, by letter dated October 30, 1978, Thomas Moorman, an executive vice-president of Western Mining, notified Standard Terminals of Western Mining's intention to warehouse steel-making nickel briquettes at the Arnold facility. (Moorman Dep. at 32–33; Moorman Dep. Ex. 3). From that time through December 1982, Western Mining stored nickel at the Arnold facility, maintaining there as much as 2204.6 metric tons. (Moorman Dep. at 41). The nickel stored at Standard Terminals' warehouse came to the United States from Australia aboard ships in sealed containers. The containers were delivered from the port of entry to Standard

Terminals' warehouse by common carrier. Standard Terminals would store the nickel, advise Western Mining of the amount delivered and issue warehouse receipts. Upon removal, Western Mining would notify Standard Terminals of the amount and destination of the nickel to be delivered. Standard Terminals would then remove the nickel from the warehouse, load it onto the carrier's vehicles and prepare bills of lading and other shipping documents. (Moorman Dep. at 22–29; Rotzler Dep. at 18–20; Novickoff Dep. at 8–11; Lewis Dep. at 12–15). Both Western Mining and Standard Terminals kept separate running paper inventories of the nickel and verified their records by physical inventories in approximately June and December of each year. (Lewis Dep. at 13; Novickoff Dep. at 7–11).

The warehouse receipts issued by Standard Terminals alerted Western Mining to read the reverse side of the receipts for conditions regarding Standard Terminals' bailment of the nickel. (Moorman Dep. Ex. 4). These conditions included the following.

### CONDITIONS

1. Limit of Bailee's liability damage or loss is $200.00 a net ton. Should Bailor desire that side limit be increased, the storage rate shall be increased by three cents per month for each additional $100.00. Nothing herein contained shall preclude Bailor from taking out such insurance protection against fire or any other casualty as it may deem advisable.

2. Any claim by Bailor against Bailee shall be presented in writing by certified mail within a reasonable time, but in no event longer than 60 days after receipt of the goods. No action may be maintained by Bailor against Bailee for loss or damage to goods unless commenced within nine months after receipt of the goods. Bailor shall be deemed to have received the goods upon delivery to it or its designated consignee.

(Moorman Dep. Ex. 5). Sometime around January 1, 1982, during a physical inventory conducted by employees of both parties, it was discovered that four metric tons of nickel valued by Western Mining at $25,044 were missing. (Lewis Dep. at 19). Both Standard Terminals and Western Mining reviewed their records separately to determine if the unaccounted for nickel could be explained by an error in bookkeeping; however, the parties' accounts were in agreement and did not explain why the nickel was missing. (Novickoff Dep. at 14 & 19; Murtha Dep. at 17; Lewis Dep. at 16 & 21). Following this initial discovery of missing nickel, Standard Terminals continued to warehouse Western Mining's nickel in the same manner and under the same procedures as it had before. (Moorman Dep. at 63). Sometime around June 10, 1982, a second quantity of four metric tons of Western Mining's nickel was discovered to be missing from the Arnold warehouse. (Lewis Dep. at 30). The parties were again unable to discover the reason for the discrepancy between their records and the actual amounts of nickel on hand at Standard Terminals. (Novickoff Dept. at 14 & 19). Standard Terminals has admitted that the material is missing, and, to date, has no specific factual knowledge of what happened to it. (Rotzler Dep. at 44).

The building in which Western Mining's nickel was stored was within the fenced-in compound. (Rotzler Aff. I Ex. A). That building was in full view of the gatehouse facing the main gate of the complex, leading to Dr. Thomas Boulevard, through which trucks entering and leaving had to pass. (Rotzler Dep. at 16). All other gates to the complex were kept locked at all times except for a six-week period in March and April 1982 when Dr. Thomas Boulevard was closed and another entrance was opened full-time to allow access to the complex. (Rotzler Dep. at 24–26; Seiber Dep. at 17–18). Other than during this period in the spring of 1982, which was after Western Mining's nickel was found to be missing, this second gate was unlocked and used only to permit the movement of rail traffic and only the main gate was open to other vehicles. (Rotzler Dep. at 24–26;

Murtha Dep. at 7–8). All trucks transporting goods to or from Standard Terminals' warehouses were weighed at the gatehouse upon both arrival and departure and both weights were noted on the bills of lading accompanying each shipment. (Murtha Dep. at 8–12).

*Discussion*

 Under Pennsylvania law, a bailment for the mutual benefit of the bailor and the bailee requires the bailee to exercise reasonable and ordinary care. *American Enka Company v. Wicaco Machine Corp.*, 686 F.2d 1050, 1053 (3d Cir.1982). When a bailment is shown to exist, the bailor makes out a prima facie case against his bailee for hire for recovery of the value of unreturned bailed goods by showing his delivery of the goods to the bailee and the latter's failure to redeliver them upon the bailor's demand. *Girard Trust Corn Exchange Bank v. Brinks, Inc.*, 422 Pa. 48, 220 A.2d 827 (1966); *Moss v. Bailey Sales & Service, Inc.*, 385 Pa. 547, 123 A.2d 425 (1956). Western Mining, the bailor, urges the extension of this rebuttable presumption of negligence to cover conversion of the bailed goods. The United States Court of Appeals for the Third Circuit has defined the Pennsylvania common law tort of conversion as

> ... an act of willful interference with the dominion or control over a chattel, done without lawful justification, by which any person entitled to the chattel is deprived of its use and possession. The tort is predicated on interference with dominion or control over the chattel incident to some general or special ownership rather than on damage to the physical condition of the chattel.

*Baram v. Farugia*, 606 F.2d 42, 43 (3d Cir.1979). The plaintiff urges our adoption of the reasoning of the Court of Appeals of New York in *I.C.C. Metals, Inc. v. Municipal Warehouse Company*, 50 N.Y.2d 657, 431 N.Y.S.2d 372, 409 N.E.2d 849 (1980). The court there found that, where there was proof of delivery to a bailee and of a subsequent failure to return bailed goods coupled with the bailee's failure to adequately explain such failure, a presumption of conversion on the part of the bailee was appropriate. *I.C.C. Metals*, 50 N.Y.2d at 664–65, 431 N.Y.S.2d at 376–77, 409 N.E.2d at 853–54.

The distinction between negligence on the part of a bailee as opposed to conversion by the bailee where, as here, the goods for all practical purposes no longer exist may seem inconsequential at first blush. The importance, however, relates to the measure of damages available to the bailor. The Uniform Commercial Code § 7–204(2), 13 Pa.C.S.A. § 7204(b), provides that a warehouseman's liability in the case of loss or damage may be contractually limited. Such a limitation is ineffective when the warehouseman converts the bailed goods "to his own use." *Id.* Unless there is adequate justification for taking the case outside the damage limitation noted earlier, any recovery to which the plaintiff is entitled will be limited to $200 per ton.

Western Mining cites the *I.C.C. Metals* case as support for their contention that, under the circumstances of this case, conversion should be presumed and recovery of the full value of the lost nickel awarded to the plaintiff. Noting initially our awareness that the *I.C.C. Metals* case holds no binding precedential value in this jurisdiction, we proceed to a brief survey of the somewhat checkered subsequent history of that decision. The case is cited in a per curiam opinion of the United States Court of Appeals for the Second Circuit, *Philipp Brothers Metal Corporation v. S.S. "Rio Iguazu"*, 658 F.2d 30 (2nd Cir.1981), which held that the district court's finding of negligence and conversion was not clearly erroneous where there was an unexplained loss of bailed goods. *Id.* at 32. And, a New Jersey trial court has cited *I.C.C. Metals* in support of the proposition that delivery, demand and failure to return constitute a prima facie case of conversion and that failure to explain the loss will result in a finding of conversion. *Joseph H. Reinfeld, Inc. v. Griswold & Bateman Warehouse Co.*, 189 N.J.Super. 141, 458 A.2d 1341 (1983).

There is, however, case law which expressly rejects *I.C.C. Metals*. The court in *Inland Metals Refining Co. v. Ceres Marine Terminals, Inc.*, 557 F.Supp. 344 (N.D.Ill., E.D.1983), found that conversion under Indiana law, which was applicable under the facts of the case, requires some affirmative wrongful act and, because the bailor failed to introduce " 'direct evidence of any positive wrongful act,' " granted summary judgment in favor of the bailee. *Id.* at 348–49. And, Judge Pollak of the United States District Court for the Eastern District of Pennsylvania found, in a case where the bailor-plaintiff urged the applicability of *I.C.C. Metals*, that when the Pennsylvania courts address the issue their conclusion will be that

> where the record is silent as to the actual disposition of the bailed goods, and that silence includes not even an attempt by the bailee to offer an explanation, the permissible inference is one of negligence but not one of conversion, with the result that the stipulated for limitation of liability will be held by the Pennsylvania courts to be effective.

*Adams v. Ryan & Christie Storage, Inc.*, 563 F.Supp. 409, 414 (E.D.Pa.1983).

■■■■ Pennsylvania, like Indiana, requires a willful interference with the dominion or control of a chattel in order to establish conversion. *Baram v. Farugia*, 606 F.2d at 43. There is no evidence in the record of any "positive wrongful act" by the bailee in its handling of Western Mining's nickel, therefore, a presumption of conversion by the bailee is inappropriate and we will not charge Standard Terminals with liability for the full value of the missing nickel on that basis.

Western Mining next argues, in effect, that even assuming no conversion by Standard Terminals the actions of Standard Terminals were so egregious as to constitute gross negligence. Their position is that a finding of gross negligence is sufficient to defeat the applicability of any liability limitation. They cite *Harding v. Harrisburg Storage Co.*, 197 F.Supp. 630 (M.D.Pa.1961), in support of this position.

Although "[t]here is no universally accepted definition of gross negligence," *Fidelity Leasing Corporation v. Dun & Bradstreet, Inc.*, 494 F.Supp. 786, 790 (E.D.Pa. 1980), courts applying Pennsylvania law have had some success formulating a functional definition.

> As a general rule courts view it as a want of even scant care, but something less than intentional indifference to consequences of acts. In a recent Pennsylvania case ..., gross negligence was defined as "a failure to perform a duty in reckless disregard of the consequences or with such want of care and regard for the consequences as to justify a presumption of willfulness or wantonness." *Williams v. State Civil Service Comm'n*, 9 Pa.Cmwlth. 437, 306 A.2d 419, 422 (1973, *aff'd*, 457 Pa. 470, 327 A.2d 70 (1974).

*Id.* (footnotes omitted).

The *Harding* case involved a deliberate breach by the bailee of its bailment contract. The court's opinion does contain a quotation from an earlier case which states that a bailee may not rely on a liability limitation when gross negligence is involved, however, the court specifically found that the defendant "clearly violated the terms of its agreement, thus bringing in effect the rule of absolute liability and the question of negligence is of no consequence." *Harding*, 197 F.Supp. at 633. We have been unable to find any case decided under the Uniform Commercial Code which stands for the proposition that contractual limitations of liability are invalid where a bailee is shown to be grossly negligent and we are unwilling to create such an exception from whole cloth. In any event, we find, as a matter of law, that the events surrounding the disappearance of the plaintiff's nickel do not constitute gross negligence on the part of Standard Terminals.

The final issue for our resolution is presented by Standard Terminals' contention that the plaintiff's claim regarding the nickel discovered missing in January 1982 is barred by the statute of limitations con-

852

tained in the warehouse receipts. Standard Terminals further contends that the entire suit is barred because Western Mining failed to submit their claims to standard Terminals by certified mail as required by the conditions of the warehouse receipts. The applicable paragraph of the conditions states that the initiating event which triggers an obligation on the part of the bailor to inform the bailee of any claim for loss or damage is "after receipt of the goods." And, the "[b]ailor shall be deemed to have received the goods upon delivery to it or its designated consignee." The forms were drafted either by Standard Terminals or its agent and, therefore, any ambiguity surrounding the interpretation of the document must be charged to Standard Terminals. *Central Transportation, Inc. v. Board of Assessment, etc.*, 490 Pa. 486, 496, 417 A.2d 144, 149 (1980); *Burns Manufacturing Co. v. Boehm*, 467 Pa. 307, 313 n. 3, 356 A.2d 763, 766 n. 3 (1976).

There is agreement among the parties that Western Mining never received the nickel in question and, thus, the literal triggering event contemplated by the terms of the condition never occurred. It is conceivable that the clause was intended by Standard Terminals to include every event giving rise to a claim by Western Mining, however, that is not the only conceivable interpretation of the terms. We hold here that the language of the conditions of the warehouse receipts under which this bailment was undertaken does not operate to preclude recovery by Western Mining for the unaccounted-for eight metric tons of nickel.

The result of our ruling is that, because of the delivery of nickel to Standard Terminals by Western Mining, Western Mining's demand of return of the nickel and Standard Terminals' failure to return the bailed nickel, the loss of the nickel may be presumed to be as a result of Standard Terminals' negligence. Standard Terminals is, therefore, liable to Western Mining in the amount of $200 per metric ton as contracted for in the warehouse receipts covering this bailment agreement.

ORDER

AND NOW, this 9th day of January, 1984, the Court makes the following ORDER:

1. The defendant's Motion to Strike the Affidavit of William N. Leiber is hereby GRANTED.

2. The plaintiff's Motion for Summary Judgment is hereby DENIED.

3. The defendant's Motion for Summary Judgment is hereby GRANTED IN PART and DENIED IN PART, and defendant's liability is limited to $200 per net ton for each of the eight unaccounted-for tons of nickel.

4. Judgment in the amount of $1,600.00 is entered in favor of the plaintiff, Western Mining Corporation, Limited, and against the defendant, Standard Terminals, Inc.