OPINION OF THE COURT
Phillip R. Rumsey, J.
PROCEEDING
Pursuant to an order dated August 15, 1995, this court awarded plaintiffs partial judgment on the issue of liability in a contract dispute. Defendant, Moishe’s Moving and Storage, Inc., had failed to appear or answer despite due and proper service of a summons and verified complaint and notice of default judgment. By defaulting, defendant is deemed to admit liability. (McClelland v Climax Hosiery Mills, 252 NY 347, 351.) On notice to the parties an inquest to determine the value of the damages incurred by plaintiff was held on September 15, 1995. Plaintiffs and their counsel were present and defendant failed to appear.
PACTS
In April 1991, defendant offered to move plaintiffs, a retired couple, from Monterey Park, California, to Cortland, New York, for $7,500 (the Pre-October 11 Contract). The offer included $5,700 for "line haul”; $400 insurance; $1,000 "extra P.U. & delivery”; and $400 in materials. Defendant was to move plaintiffs to New York on October 11, 1991. In mid or late September and on October 8, 1991, plaintiff Jimmy Beck called defendant to confirm the move and their contract. At no time did defendant say it would be unable to perform as agreed in April. In reliance on defendant’s assertion, plaintiffs made plans to fumigate their house following the move and for the next residents to move in immediately after fumigation.
On October 11, defendant’s employees (the Movers) arrived at plaintiffs’ residence and, without looking at the quantity of *962 items to be moved, said that defendant could not move at the price that had been agreed upon by plaintiffs and defendant. According to plaintiffs’ testimony, the Movers became quite agitated and began screaming and yelling. The Movers called their office and, after two or three hours of discussion, said they could accomplish the move for $8,795. This included $7,495 for "line haul”; $400 for insurance; $448.50 for materials; and $451.50 for packing. The written document, which was prepared on a form of the same type that had been used to form the basis of defendant’s offer in April, included the following language: "shipper hereby releases the entire shipment to a value not exceeding * * * [written] $40,000.00.” (Plaintiffs’ exhibit 6.)[1]
Plaintiffs objected to the new price of $8,795 but realized they had no choice. It was getting late in the day, and they needed their property moved. Plaintiff Jimmy Beck testified that several moving companies told him they required at least 30 days’ advance notice to move. Since plaintiffs had to move on the 11th, there was no time to hire a different mover. Plaintiffs also testified that the Movers were loud and aggressive, banging the wall with their fists and physically intimidating them. The behavior of the Movers instilled fear in the plaintiffs. Mrs. Beck testified that the Movers’ conduct caused her to fear for her physical safety.
Part way through the packing process, the Movers approached plaintiffs about paying something they said was a "tipping fee”. Plaintiff Jimmy Beck testified he was not previously aware of the requirement, that the Movers said they would not do the work without the "tipping fee”, and that they would not accept a check for the "tipping fee”. Plaintiffs paid the Movers $600 in "tipping fees” in California. The Movers told the Becks that, if plaintiffs did not pay the "tipping fee”, their boxes and the truck might get lost.
The truck that arrived at plaintiffs’ residence in New York was not the same truck that had been loaded in California, where plaintiffs had sealed many of their boxes with clear *963 packing tape. In New York, plaintiffs discovered that the boxes were sealed with a yellow tape. Some items they had packed in one box were found in another. Some items were broken. Some items were missing. Plaintiffs’ exhibit 1, as amended by exhibit A attached to plaintiffs’ closing statement, sets forth an inventory of plaintiffs’ personal property that was broken or never delivered to their New York residence. Finally, the Movers demanded a new tipping fee when they arrived in New York. Plaintiffs paid $200 in response to this demand. The record shows that defendant was similarly threatening to plaintiffs in New York.
Following the move, plaintiffs submitted a claim to defendant. In a letter dated November 8, 1991, defendant acknowledged receipt of plaintiffs’ claim.
BREACH
Plaintiffs entered into a contract with defendant before the October 11 moving date. The contract called for defendant to move plaintiffs to New York on October 11, 1991 for a total sum of $7,500. This sum, as indicated by the $400 insurance charge noted on the Pre-October 11 Contract included $40,000 of insurance coverage. The Pre-October 11 agreement, by its terms, required an "express release” for liability exceeding 30 cents per pound or $2,500. The $400 insurance charge in the Pre-October 11 Contract establishes that defendant had agreed to provide plaintiffs with an express release for $40,000 in coverage.
Defendant’s failure to perform according to the terms of its Pre-October 11 Contract with plaintiffs left it subject to damages incurred in its breach. According to the terms of that contract, defendant was liable for up to $40,000 in losses or damages to plaintiffs’ property.
DAMAGES
Damages for breach of contract are awarded to make the nonbreaching party whole. In the instant case, the loss to the nonbreaching party was equal to the cost of repairing broken goods and replacing lost goods, up to the $40,000 in insurance to which the parties had agreed.[2] Punitive damages are awarded "not only to punish the defendant but to deter him, *964 as well as others who might otherwise be so prompted, from indulging in similar conduct in the future.” (Walker v Sheldon, 10 NY2d 401, 404.)

Lost and Damaged Property

Plaintiffs are entitled to recover the value of goods that defendant lost and the cost of repairing or replacing the goods that defendant damaged. Plaintiffs are also missing several items, such as family photographs, on which a court cannot place a value and for which plaintiffs will not receive compensation. "In determining the general or market value of personal property prior to loss, the key factor is its value or reasonable worth at the time and place of its taking or destruction, but it may be necessary to resort to proof of value at some other time or place.” (36 NY Jur 2d, Damages, § 81.) The items which defendant lost included personalty such as pillow cases, lamps, and tools for which even ordinarily prudent people do not keep receipts or other records regarding date or cost of acquisition. As a result, it is virtually impossible to prove the original purchase price of the goods. Plaintiffs’ expert witness, an appraiser, estimated the replacement cost of goods lost, stolen, missing, or damaged to be $17,472.66, and plaintiffs are entitled to that sum for defendant’s failure to deliver the household goods as promised.

Increase in Contract Price and Tipping Fees

Duress exists "where one is compelled to perform an act which he has a legal right to abstain from performing. The compulsion must be such as to overcome the exercise of free will” (Gerstein v 532 Broad Hollow Rd. Co., 75 AD2d 292, 297). Plaintiffs had an agreement with defendant to move plaintiffs’ household goods for $7,500. On the day of the move, defendant demanded an additional $1,295 in moving fees and $600 in "tipping fees”. The Pre-October 11 Contract gave plaintiffs a legal right to have defendant move their belongings for $7,500. Plaintiffs’ need to move out of their California residence (to allow for fumigation and the next residents to arrive), their inability to get a different mover for at least 30 days, and the Movers’ veiled threats about things getting lost or destroyed, combined to compel plaintiffs to accede to defendant’s October *965 11 demands. This presents a clear case of duress. Since these additional payments of $1,895 were also made despite plaintiffs’ legal right not to make them, plaintiffs are entitled to recover these payments on the basis of duress.
Plaintiffs further testified that the Movers’ behavior was similar on their arrival in New York. In response to defendant’s demand, plaintiffs paid the Movers an additional $200 in "tipping fees” under duress in New York. Plaintiffs are also entitled to recover this payment.
Even absent a finding of duress, defendant’s liability under the Pre-October 11 Contract would permit as an award to plaintiffs an amount of $2,095 for restitution of money that they paid to defendant over the agreed-upon $7,500 contract price.

Punitive Damages

The award of punitive damages in a contract action requires that the breaching party be malicious and vindictive or wanton and reckless. (Reinah Dev. Corp. v Kaaterskill Hotel Corp., 59 NY2d 481, 487-488.) "Punitive damages are not recoverable for an ordinary breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights.” (Rocanova v Equitable Life Assur. Socy., 83 NY2d 603, 613.) Defendant’s conduct in this matter has clearly been of an intentional nature. Defendant had a valid contract with plaintiffs and, owing to plaintiffs’ need to move on October 11, forced plaintiffs to pay additional money. The behavior of defendant’s employees was threatening and intimidating. After engaging in such conduct and referring to possible reprisals for noncompliance with new demands, defendant lost and destroyed that which it had agreed to move in a safe manner.
Defendant operates in a consumer transaction business. The public puts its faith in defendant that defendant will move household goods with care, for an agreed-upon price, and without displays of physical intimidation or threats of nonperformance. An award of punitive damages will impress upon defendant and others similarly situated the importance of avoiding such intentional misconduct in its dealings with the public. For the foregoing reasons, the court hereby orders defendant to pay plaintiffs $10,000 in punitive damages.
CONCLUSION
Plaintiffs are entitled to the following damages: $1,295 for the increase in the Pre-October 11 Contract price; $600 for *966 "tipping fees” paid in California; $200 for "tipping fees” paid in New York; $17,472.66 for lost and damaged property; and $10,000 in punitive damages.

. The Pre-October 11 Contract and the October 11 "contract” also included the following language: "[U]nless the shipper expressly releases THE SHIPMENT TO A VALUE OF 30 CENTS PER POUND PER ARTICLE, THE CARRIER’S MAXIMUM LIABILITY FOR LOSS AND DAMAGE SHALL BE EITHER THE LUMP SUM VALUE DECLARED BY THE SHIPPER, OR $2,500, WHICHEVER IS GREATER.” (Plaintiffs’ exhibits 1, 6.) Both "contracts” further included the following provision: "Sec. 7. As a condition precedent to recovery, a claim for any loss or damage, injury or delay, must be filed in writing with the carrier within nine (9) months after delivery to consignee.” (Plaintiffs’ exhibits 1, 6.)

. The court notes that evidence of willful breach on the part of the breaching party would leave them subject to damage claims exceeding the agreed-upon insurance coverage. (See, I.C.C. Metals v Municipal Warehouse Co., 50 NY2d 657, 669 [Jasen, J., dissenting] [pointing out that a warehouse *964 man is liable for any amount in excess of agreed-upon coverage after committing an intentional tort].) Since the agreed-upon insurance coverage exceeds the losses claimed by the plaintiffs, the court does not address the question of whether defendant’s breach of contract was willful.