99 N.Y.2d 165 (2002)
783 N.E.2d 484
753 N.Y.S.2d 419
MIDORI SHIMAMOTO, as Administrator of the Estate of BART SCHWARTZ, Deceased, et al., Appellants,
v.
S&F WAREHOUSES, INC., et al., Respondents, et al., Defendants.
Court of Appeals of the State of New York.
Argued September 4, 2002.
Decided October 24, 2002.
*166 *167 William Joseph Apuzzo, New York City, and David D. Chase for appellants.
*168 Stuart Halper and Associates, Briarcliff Manor (Stuart Halper and Steven N. Feinman of counsel), for S&F Warehouses, Inc. and another, respondents.
Simon, Meyrowitz & Meyrowitz, LLP, New York City (Edward S. Feldman of counsel), for Simon, Meyrowitz, Meyrowitz *169 & Schlussel, respondent.
Judges SMITH, LEVINE, WESLEY, ROSENBLATT and GRAFFEO concur with Judge CIPARICK; Chief Judge KAYE dissents and votes to affirm in a separate opinion.

OPINION OF THE COURT
CIPARICK, J.
On this appeal we consider whether plaintiff-merchant can maintain an action under UCC 7-210 for damages allegedly caused by defendants' conduct in the sale of commercial goods in order to satisfy a lien for unpaid warehouse charges. We agree with the Appellate Division that there was insufficient evidence of willful conduct to hold defendants liable for conversion damages under UCC 7-210 (9). However, a question exists as to whether defendants may be held liable for a nonwillful violation of the statute and the matter must be remitted for a new trial on the "commercial reasonableness" of the sale and entitlement to damages.
Between 1980 and 1981, plaintiff's decedent, Bart Schwartz, a textile importer and owner of plaintiff corporation Ultra Cashmere House, Ltd., imported more than 60,000 yards of ultra cashmerea synthetic suede-like fabric. On its arrival from Italy, the material was stored at a bonded Brooklyn warehouse not a party to this action. When a dispute arose *170 between Schwartz and the warehouse over an alleged loss of several cartons of fabric, the United States Customs Service, which holds an as-yet unpaid lien for customs duties, requested that defendant S&F Warehouses store the material in its bonded Brooklyn Navy Yard warehouse. In November 1986, defendant S&J Trucking transported the material to its affiliate S&F Warehouses (collectively the warehouse defendants). Plaintiff agreed to pay $640.80 per month for storage of the material; the agreement also capped defendant's liability for damages to the goods at 100 times the monthly storage fee. Plaintiff's account thereafter fell into arrears.
In 1991, the warehouse retained defendant law firm Simon, Meyrowitz, Meyrowitz & Schlussel to collect unpaid storage fees. The law firm, in turn, hired defendant F.E.S. Auctions, Inc. to satisfy the lien by selling the goods. F.E.S. prepared a "Notice of Sale on Lien," addressed to Schwartz at a Manhattan address, which stated that S&F Warehouses claimed a lien in excess of $42,847 for storage of the merchandise with an estimated value of $25,000. The notice further stated that, if the lien was not satisfied, the merchandise would be advertised for sale "as provided for under the Lien Law" and sold to the highest bidder at a public auction to be held at the law firm's offices on September 24, 1991. The notice did not contain a statement that Schwartz had the right to challenge the existence or accuracy of the lien in a court proceeding pursuant to UCC 7-211. Plaintiff concedes the validity of the lien, but claims that defendants failed to credit $5,000 in payments.
The auctioneer forwarded a copy of the notice to the law firm, which did not review it for compliance with UCC requirements before F.E.S. mailed it. After advertising the sale in the September 9th and 16th issues of American Banker, a daily publication of limited circulation, the auctioneer conducted a sale on September 24, 1991 at the law firm offices. With no other prospective buyers in attendance, the auctioneer entered and accepted a bid of $25,000 on behalf of S&F Warehouses. No money was exchanged; S&F merely obtained a bill of sale, becoming title owner of the goods. Two days after the sale Schwartz appeared at defendant law offices inquiring after his goods and was informed that the fabric had been sold at auction to the warehouse defendants. Schwartz did not attempt to settle his warehouse account or recover the goods.
Plaintiff commenced this action in Supreme Court alleging causes of action for conversion under UCC 7-210, violation of due process rights under the State Constitution, fraudulent *171 violation of the requirements of UCC 7-210, violation of New York City Charter and Administrative Code provisions, and negligence in the sale of goods in a commercially unreasonable manner.[1] In addition to the corporate defendants, the complaint named individual officers of the warehouse, trucking company, law firm and auctioneer. Shortly before trial, Supreme Court denied a motion by the trucking and warehouse defendants to cross-claim against the law firm. Plaintiff then stipulated to dismissal of the complaint against F.E.S., including its principal, as well as the named partners of the law firm. At the close of evidence, Supreme Court directed a verdict in favor of the law firm finding that while the law firmand the earlier dismissed auctioneerhad acted negligently, the law required their negligence to be imputed to the warehouse and trucking company defendants. Thus, the court directed a verdict against the warehouse defendants on conversion liability and submitted the issue of damages to the jury.
The Appellate Division reversed, vacating the directed verdicts against the warehouse defendants and in favor of the law firm (257 AD2d 334 [1999]). In its view, UCC 7-210 (1) imposed a requirement of reasonableness on the sale of warehoused commercial goods in order to enforce a lien and, to the extent the warehouse defendants adopted a prudent course of action by referring the matter to an attorney for enforcement of the lien, they could not be deemed to have acted unreasonably. Moreover, for Supreme Court to direct a verdict against defendants who prudently hired an attorney while simultaneously directing a verdict in favor of the same attorney who failed to inspect the notice of sale was, in the Appellate Division's opinion, repugnant to common sense.
Focusing on the requirement in UCC 7-210 (9) of a "willful violation" before liability for conversion damages could attach, the Appellate Division observed that among the few authorities that had considered the question of willfulness, subdivision (9) called for a reckless disregard for the requirements of the statute or a deliberate unwillingness to ascertain those requirements. The Appellate Division further determined that although the preparation of a notice of lien sale without reference to plaintiff's right to challenge the lien in court might be deemed inadvertent, it could not be deemed willful. Finally, the Appellate Division dismissed the claims against all the *172 individually named defendants and reversed the jury's award of damages. Although the Court noted a number of other deficiencies in the notice, such as the failure to publish the telephone number or address of the law office where the sale was to take place, ultimately the Court determined that "UCC 7-210 (1) requires only that the sale be conducted in a `commercially reasonable' manner, after all interested parties are notified of the nature, time and place of the sale, the amount due, and their right to challenge in a special proceeding the validity of the lien or the amount claimed" (see 257 AD2d at 337). The Court remanded the case for trial on the commercial reasonableness of the sale and on damages (see 257 AD2d at 342). Thereafter, the Appellate Division granted a motion for clarification of its previous order and dismissed plaintiff's conversion claims in their entirety.
Before the second trial began, the law firm and warehouse defendants moved to dismiss plaintiff's remaining claims on the grounds that plaintiff failed to demand return of the goods. Citing I.C.C. Metals v Municipal Warehouse Co. (50 NY2d 657 [1980]) and Claflin v Meyer (75 NY 260 [1878]), Supreme Court held that a demand for return of goods was a condition precedent to commencement of an action. Since plaintiff failed to satisfy this condition, Supreme Court dismissed the remaining claim for negligence. The Appellate Division affirmed for the reasons stated by Supreme Court (288 AD2d 150 [2001]). We granted plaintiff leave to appeal (97 NY2d 613 [2002]), bringing up for review the most recent Appellate Division order as well as the prior nonfinal orders of that Court, and now modify.

Analysis
Enforcement of what has traditionally been called the "warehouseman's lien" is governed by UCC 7-210. That section provides a self-help mechanism for recovery of delinquent storage charges through the sale of stored goods. The statute details procedures for enforcement of liens on goods stored by a merchant in the course of business, in subdivision (1), and enforcement of liens on nonmerchant goods in subdivision (2); however, notice of UCC 7-211 rights is a requirement for both types of foreclosure sales.[2] The pertinent portion of subdivision (1) follows:

*173 "a warehouseman's lien may be enforced by public or private sale of the goods in bloc or in parcels, at any time or place and on any terms which are commercially reasonable, after notifying all persons known to claim an interest in the goods. Such notification must include a statement of the amount due, the nature of the proposed sale and the time and place of any public sale, and, unless the goods are perishable or threaten to decline speedily in value, it shall state that any person claiming an interest in the goods is entitled to bring a proceeding under section 7-211 within ten days of the service of the notice if he disputes the validity of the lien or the amount claimed" (emphasis added).
UCC 7-210 (9) describes damages that may be recovered when there has been a failure to comply with other requirements of the section. Specifically, it provides that a warehouse "is liable for damages caused by failure to comply with the requirements for sale under this section and in case of willful violation is liable for conversion." This section defines the circumstances under which two different types of damages are awarded; it does not, however, create two separate causes of action. The violation that gives rise to a cause of action is a failure to comply with requirements of section 7-210. Once the degree of culpability associated with the violation is fixed, the appropriate damages follow. Conversion damages flowing from willful violation under UCC 7-210 (9) are the value of the goods at the time of conversion less any offset for unpaid shipping and storage charges (see 3 White and Summers, Uniform Commercial Code § 28-6, at 317 [Practitioner's 4th ed]). By comparison, actual damages flowing from a violation that is less than willful have been defined as the difference between the amount actually made from the sale of goods and the amount that would have been realized had the sale been commercially reasonable (see 3 White and Summers, Uniform Commercial Code § 28-6, at 317-318 [Practitioner's 4th ed]).
This Court has not previously considered what constitutes a willful violation for purposes of UCC 7-210 (9). The Appellate Division defined the term as "a grossly reckless disregard for legal obligations, manifested by conscious non-compliance with, or deliberate unwillingness to discover *174 and obey, the law" (257 AD2d at 339, citing In re Grant, 182 BR 709, 718, affd 1995 WL 560041, 1995 US Dist LEXIS 13867 [ED Pa, Sept. 20, 1995, Weiner, J.]). Inasmuch as this definition comports with traditional formulations of the recklessness standard used in UCC and other contexts, it suffices here (see generally 7A Lawrence's Anderson on the Uniform Commercial Code § 7-210:36, at 983 [3d ed rev 2001]).
We also agree with the Appellate Division that the evidence at trial was not sufficient to show recklessness on the part of the defendants here. The warehouse and trucking defendants prudently referred collection of their lien to an attorney who, in turn, reasonably hired an auctioneer to perform a sale. The auctioneer, unaware of the specific UCC provisions relating to warehouse lien sales, prepared an outdated "form" notice of sale which did not contain a notice of UCC 7-211 rights. Even the failure of the attorney to review the notice of sale, which is perhaps the most troubling of the lapses that took place here, did not evince the intentional disregard that is at the core of recklessness. Thus, we are left with a possible statutory violation compensable only by "damages caused by failure to comply with the requirements for sale" (see UCC 7-210 [9]).
The lien foreclosure process of section 7-210 does not, however, contain a requirement of a demand for the return of goods as a condition precedent to commencement of an action arising out of a noncommercially reasonable sale or other negligent violation of UCC 7-210. In this case plaintiff had no viable cause of action for either common-law or statutory conversion. The fabric having been sold at a warehouse lien foreclosure sale pursuant to UCC 7-210 (1), plaintiff's remedy was limited to a statutory cause of action challenging that sale under UCC 7-210 (9). Thus, the parties must look to the specific requirements of the statute to define their rights and responsibilities when no conversion has occurred. Just as the procedures for a proper sale are outlined in subdivision (1), the requirements for a cause of action in damages are contained in subdivision (9). Subdivision (9) does not contain or even suggest the necessity of a demand for return of the goods.
I.C.C. Metals v Municipal Warehouse Co., relied on by the courts below, does not compel such a requirement (see 50 NY2d 657 [1980]). The issue in I.C.C. Metals was whether a contractual limitation on a warehouse's liability could be given effect where the plaintiff established entitlement to summary judgment on a claim of conversion. In that case, the plaintiff stored *175 three lots of an industrial metal worth $100,000, receiving warehouse receipts containing a limitation of the defendant warehouse's liability. When plaintiff requested one of the lots back, defendant admitted the entire bailment had been lost. Focusing on the distinction between intentional and unintentional torts as they relate to UCC 7-204, and policy considerations related to contractual limitations on liability, we held that a warehouse may limit its liability for loss of goods resulting from acts of ordinary negligence but not for conversion. The necessity of a demand was not a central issue in I.C.C. Metals. The "demand" that occurred was nothing more than a request by the plaintiff bailor for return of one of three lots of stored metal which, when unanswered, led to discovery of the loss and provided prima facie proof of conversion.
More significantly, I.C.C. Metals involved claims for common-law negligence and conversion. Unlike this case, I.C.C. Metals did not involve a warehouse lien, much less an attempt to enforce one, or this unique statutory cause of action for improper foreclosure. Schwartz v Capital Liquidators, Inc. (984 F2d 53 [2d Cir 1993]) likewise involved a claim for common-law conversion. We perceive no need to add a requirement of a demand for return of goods into a case involving a statutory cause of action based on a failure to comply with the statutory foreclosure process in UCC 7-210. To the extent plaintiff is entitled to damages here, it is for the warehouse's failure to follow the requirements of the statute. Moreover, the policy considerations that make a demand appropriate for a claim of common-law conversion are not present in the context of UCC 7-210.
Plaintiff also contends that the failure to include notice of section 7-211 rights in the notice of sale was a violation of current subdivision (1) requirements. Defendants candidly admit this failure. As commentators have noted, the notice requirement in UCC 7-210 (1) is a strict one (see 3 White and Summers, Uniform Commercial Code § 28-6, at 314-316 [Practitioner's 4th ed]).[3] Even if a failure to comply with this requirement violates some right, a plaintiff still must plead and prove that the violation caused damages. Here plaintiff has failed to demonstrate how the omission of section 7-211 rights caused damage since the existence of the lien is conceded.
*176 However, plaintiff has also alleged that the foreclosure was not conducted in a commercially reasonable manner. Plaintiff has not had the opportunity to establish that fact and, if established, the actual damages caused thereby. Thus, remittal is necessary. In order to establish entitlement to damages, plaintiff is obliged to show how some aspect of the sale rendered it commercially unreasonable, resulting in lower proceeds than a commercially reasonable sale would have produced (see 3 White and Summers, Uniform Commercial Code § 28-6, at 317-318 [Practitioner's 4th ed]). Proof of the value of the material, while relevant, is not conclusive in this context. Indeed the statute provides that the "fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the warehouseman is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner" (UCC 7-210 [1]). What is required from plaintiff is proof that some aspect of defendants' sale fell short of the effort that an ordinarily diligent warehouse lienholder would expend to sell the material (see 4 White and Summers, Uniform Commercial Code § 34-11, at 401-407 [Practitioner's 5th ed]). Such proof should necessarily entail evidence that a commercial market for ultra cashmere existed at the time of the sale and that defendant could have sold the fabric for more than $25,000 if it had been sold in a commercially reasonable manner. Even then, should plaintiff prevail on the issue of commercial reasonableness, plaintiff would still be required to show that the sale would have yielded proceeds in excess of the warehouse lien and the outstanding customs lien, sufficient to warrant a recovery in damages.
Accordingly the order of the Appellate Division should be modified, without costs, the complaint against the law firm and warehouse defendants reinstated and the matter remitted to Supreme Court for further proceedings in accordance with this opinion and, as so modified, affirmed.
Chief Judge KAYE (dissenting).
Like the courts below, I would grant defendants summary judgment because plaintiffs failed to tender the outstanding storage fees and demand return of their goods. That is clearly the better, and correct, result in the present circumstanceswhere the commercial warehouseman was the sole bidder, bought the 60,000 yards of ultra cashmere at a price less than the value of the lien and, even after the sale, itself retains the goods.
This is the first case in which we are called upon to construe *177 UCC 7-210. It is not, however, the first case in which a warehouseman is accused of conducting a warehouse sale improperly, and therefore misappropriating plaintiffs' goods. Such cases arose under General Business Law § 118, the predecessor to UCC 7-210 (see e.g. Lake v Dye, 232 NY 209 [1921]; Maritime World Corp. v Grefe Steel Warehouse Corp., 154 NYS2d 684 [Sup Ct, Trial Term, NY County 1956]). As those cases illustrate, courts likened the bailor's cause of action to a claim for conversion, although that term did not appear in General Business Law § 118 (see Lake, 232 NY at 212; Maritime, 154 NYS2d at 685). They did so because they recognized the cause of action as one based on an alleged interference with an owner's right to possess personal property, even when aspects of the interference arose within a statutory framework.
As those cases further illustrate, courts assessing the conduct of warehouse sales routinely drew on the common law to fill gaps in the existing legislative scheme. For example, in Lake we used common-law precedents to determine the measure of damages. We also recognized that while the statutes creating warehouse sale procedures were enacted in derogation of the common law, it would be "unreasonable" to expect warehousemen advertising such sales to list the items offered in as much detail as the bailors inevitably wished. And we brushed aside a bailor's arguments based on a discrepancy between the warehouse sale date on the notice to her and the date on the public announcementfor we recognized that this discrepancy did not harm the plaintiff under the circumstances. In short, we construed the statute with sensitivity to commercial reality. And we did so with considerably less statutory encouragement than we have todayfor unlike UCC 7-210, General Business Law § 118 did not explicitly authorize courts to apply a rule of reason to any aspect of a disputed warehouse sale.
UCC 7-210 departs from its predecessor, General Business Law § 118, in several respects. First, it provides a simplified procedure for warehouse sales when the bailor is a merchant, and permits such sales to be conducted "on any terms which are commercially reasonable" (see UCC 7-210 [1]). Second, it permits a warehouseman conducting a public warehouse sale to buy the goods (see UCC 7-210 [4]). Finally, it provides for a lesser level of damages in case of nonwillful violation of the statutory sale procedures (see UCC 7-210 [9]). Each of these provisions differs from previous law, as the 1955 Report of the Law Revision Commission observed (see 1955 NY Legis Doc No. 65 [H], at 43-44). Their cumulative effect is clearly to liberalize the law to the advantage of warehousemen.
*178 In adopting these procedures, the drafters doubtless anticipated cases in which a warehouseman would sell bailed goods to a third party to satisfy a lienas was already possible under General Business Law § 118and cases in which the warehouseman would buy the goods at a public sale and resell them, or even possibly utilize them. Here, however, the warehouseman has bought the bailed goods, and has neither sold them nor done anything else with them. In these unusual circumstances, we look to related statutory provisions and the common law for guidance.
Article 1 of the UCC sets forth the Legislature's intention for the statute to be construed to promote the continued expansion of commercial practices; presumes a general obligation of good faith; and leaves intact principles of law and equity not displaced by particular provisions of the statute (see UCC 1-102, 1-103). More specifically, in reviewing a claim under UCC 7-210 we may consider how this section relates to the remainder of article 7 andwhere article 7 is silentthe common law.
Under UCC 7-403, a warehouseman generally must deliver bailed goods to a person entitled to the goods under a warehouse receipt, but is excused from doing so ifamong other possibilitiesthe claimant fails to satisfy the bailee's lien upon request (UCC 7-403 [2]) or the warehouseman establishes "previous sale or other disposition of the goods in lawful enforcement of a lien * * *" (UCC 7-403 [1] [c]). Thus, the design of UCC 7-403 contemplates that a lawful warehouse sale may be asserted as a defense under that section when a bailor claims a warehouse has wrongfully withheld goods. It also presupposes that bailors want to possess their goods and will seek to reclaim them from the warehouse if they are still available. UCC 7-210, with its procedures for the conduct of warehouse sales, should be construed to harmonize with this provision.
As commentators have recognized, UCC 7-210 is part of an integrated statutory scheme, to be read in pari materia with UCC 7-403:
"Section 7-210 (1) and (2) set forth procedures whereby the warehouseman may foreclose its lien through sale of stored goods. These procedures are designed to protect the owner or other claimant's right to redeem the goods (7-210 (3)) as well as to secure the likelihood that a fair price will be realized *179 from the sale foreclosing the warehouseman's specific lien. The warehouseman is not to sell more goods than reasonably necessary to satisfy the warehouseman's claims. Further, 7-403 (1) (c) provides that a proper foreclosure sale gives the warehouseman a lawful excuse for non-delivery of the goods sold. The warehouseman must, however, account for any surplus from the sale proceeds under 7-210 (6)" (3 White and Summers, Uniform Commercial Code § 28-6, at 314 [Practitioner's 4th ed] [emphasis added]).
As the emphasized language recognizes, a violation of UCC 7-210 may take away whatever "lawful excuse" a warehouseman would otherwise have had for nondelivery under UCC 7-403. And, of course, most warehouse sales will result in the goods' passing into the hands of a third party who will hold them "free of any rights of persons against whom the lien was valid" (UCC 7-210 [5]), rendering delivery of the goods by the warehouseman impossible and demand by the bailor futile.
But UCC 7-210 was not intended to obviate a request for the goods when circumstances overwhelmingly suggest that their return is possible and would occur immediately upon tender. Under these circumstances, plaintiffs generally should be required to demand the goods, regardless of whether they style their claims as negligence or conversion (see I.C.C. Metals v Municipal Warehouse Co., 50 NY2d 657, 660-662 [1980]; Schwartz v Capital Liquidators, Inc., 984 F2d 53, 54 [2d Cir 1993]). In a situation such as the one before us, requiring demand would discourage meritless lawsuits by ensuring that bailor-plaintiffs consider their goods to be worth at least the amount of the lien. Had plaintiffs tendered the outstanding fees to the warehouseman, I suspect they would have had their fabric instead of a decade of litigation, and now the prospect of more litigation.
Order modified, without costs, and case remitted to Supreme Court, New York County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.
NOTES
[1] Bart Schwartz died during the pendency of this action. He has been substituted by the administratrix of his estate.
[2] Subsequent to this Court's holding in Svendsen v Smith's Moving & Trucking Co. (54 NY2d 865 [1981]) which found UCC 7-210 (2) violative of due process in permitting ex parte lien foreclosures against nonmerchants without notice, the Legislature amended both subdivisions (1) and (2) of UCC 7-210 to require notice of section 7-211 rights to "any person claiming an interest in the goods" (see L 1982, ch 528). As a result, notice of section 7-211 rights is now mandatory in both kinds of warehouse lien foreclosures.
[3] Although most states do not require notice of the right to challenge a lien in a special proceeding, to the extent commentators have observed that other notice requirements of this subdivision are strictly enforced, the same should also be true of New York's UCC 7-211 notice requirement.